### Richmond

EDNA G. BROOKS, Administratrix of the
Estate of Marty Lee Brooks, deceased

v.

### TROY K. PAINTER

April 29, 1983.

Record No. 801897.

Present: Carrico, C.J., Cochran, Poff, Compton, Stephenson, Russell, JJ., and Harrison, Retired Justice.

*Beverly C. Read* for appellant.

*James G. Welsh (Timberlake, Smith, Thomas & Moses, P.C.,* on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

This wrongful death case requires us to reexamine the statutory definition of a "residence district," for the purpose of determining the applicable speed limit.

Marty Lee Brooks, on March 31, 1978, died as a result of a collision with a truck operated by Troy K. Painter, the defendant. The evidence showed that Brooks was travelling eastbound on State Route 56, in Rockbridge County, on a motorcycle. He had passed a sign indicating that he had entered the village of Vesuvius, but there were no speed limit signs posted in the area. His speed was "approximated" by Mark Congdon, a disinterested witness, at thirty-five miles per hour. Painter's truck was travelling westbound at a very low speed, estimated at less than twenty miles per hour. Painter and his wife, a passenger in the truck, testified that they saw the motorcycle approaching around the curve "leaning over, at a high speed, and smoke coming out of it." They testified that Brooks evidently lost control on the curve and was thrown from the motorcycle before the collision, that they swerved left to avoid the riderless motorcycle, but that it turned sideways and "slid into us." Painter said that he had moved to the left and nearly stopped his truck when struck. Mark Congdon was following the Painters' truck through the village. He testified that he saw the truck move across the centerline into the eastbound lane as the motorcycle approached. Fearing a collision, he slowed. He hoped the motorcyclist could evade the truck, but a head-on collision took place. He said he saw Brooks' body bounce off the truck and that Brooks "flew through the air a pretty good ways."

Counsel submitted to the court as a matter of law the question whether the area was a "residence district," as defined by Code § 46.1-1(24), so as to be governed by the twenty-five mile speed limit prescribed for such districts by § 46.1-193(1)(g). Based upon a view, a plat in evidence, and the testimony of a surveyor, the court ruled that the area in question was a residence district. The jury was therefore instructed that the applicable speed limit was twenty-five miles per hour, that if Brooks exceeded that speed he was negligent, and that if such negligence approximately contributed to cause his death, the jury must find for the defendant. A verdict for the defendant resulted. We granted an appeal limited to the question whether the area in question met the statutory definition of a "residence district."

█ Code § 46.1-1(24) defines "Residence district":

The territory contiguous to a highway, not comprising a business district, where seventy-five per centum or more of the property contiguous to such highway, on either side of the highway, for a distance of three hundred feet or more along the highway is occupied by dwellings and land improved for dwelling purposes, or by dwellings, land improved for dwelling purposes and land or buildings in use for business purposes.

We construed the predecessor to this section in *Thoms* v. *Dowdy*, 201 Va. 581, 112 S.E.2d 868 (1960), where we adopted the view that the determinative section of road was that which extends 300 feet in the direction of travel of the vehicle whose speed is in question, terminating at the point of impact. Other states having similar statutes apply the same test. *Hinson* v. *Dawson*, 241 N.C. 714, 86 S.E.2d 585 (1955); *Krepcik* v. *Interstate Transit Lines*, 154 Neb. 671, 48 N.W.2d 839 (1951). Our consideration is thus confined to the 300-foot segment of Route 56 which lies west of the point of impact.

The evidence shows that the area is occupied by dwellings spaced more than 100 feet apart. The land between the buildings, extending to the edge of the road on both sides, consists of mowed lawns, unfenced gardens, and a fenced pasture where horses graze. If the determinative factor is the percentage of land actually covered by buildings used for residential purposes, the construction we adopted in *Thoms*, then the area in question is clearly not within the statutory definition because far less than seventy-five percent of the frontage is covered by buildings. The applicable speed limit would then not have been twenty-five miles per hour, as the court instructed the jury. Code § 46.1-193.

The trial court, however, agreed with Painter's contention that the 1968 amendments to the statute changed the rule of *Thoms*. This view requires a construction under which all land contiguous, appurtenant, and used in connection with dwellings, i.e. the curtilage, should be considered. The argument is based on the insertion, in 1968, of the words "and land improved for dwelling purposes" at the two points where it now appears in the statute. This view would require a driver approaching an unfamiliar area, not posted by speed-limit signs, to determine what percentage of the land surrounding dwellings was in actual use as curtilage, and to adjust his speed accordingly before arrival. The distance between

the dwellings would be immaterial. How this could be accomplished at night, or in conditions of poor visibility, is unexplained.

We do not think the General Assemby had any such intention in 1968. The speed laws not only create civil duties, but are also penal in nature. It is axiomatic that a citizen must be given a fair opportunity to determine from the facts as they appear, before engaging in a proposed course of action, whether it will be unlawful.

In our view, the amendments accomplished a dual purpose. When *Thoms* was decided, both sides of the road were to be considered in determining the existence of a "residence district." A 1964 amendment substituted the words "either side" for "both sides," so that a residence district may now be found to exist if only one side of the road meets the test. The insertion, in 1968, of the phrase "and land improved for dwelling purposes" may have been intended to bring under the protection of the statute residential sites or subdivisions which are under construction, for the protection of workmen and others entering and leaving the sites. Partially completed houses in such a situation could not yet be characterized as "dwellings," but the land under them would be "improved for dwelling purposes."

We adhere to the view adopted in *Thoms*: the purpose of the statute is to restrict speed on a road where seventy-five percent of the frontage on either side is "built-up, that is, actually 'occupied' or covered by buildings used [or, now, under construction] for the stated purposes, a situation obvious to a driver." 201 Va. at 584, 112 S.E.2d at 870.

Thus the trial court erred in determining that the area in question was a "residence district" and instructing the jury that Brooks was governed by a speed limit of twenty-five miles per hour. For this reason, the judgment of the trial court will be reversed and the case remanded for new trial.

*Reversed and remanded.*